**IN THE UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF ARKANSAS**
**DELTA DIVISION**

ALAN BELL,                                                                                    PLAINTIFF
ADC #158013

v.                                              2:20CV00021-BSM-JTK

JAMES DYCUS, et al.                                                                 DEFENDANTS

## PROPOSED FINDINGS AND RECOMMENDATIONS

### INSTRUCTIONS

The following recommended disposition has been sent to United States District Judge Brian S. Miller. Any party may serve and file written objections to this recommendation. Objections should be specific and should include the factual or legal basis for the objection. If the objection is to a factual finding, specifically identify that finding and the evidence that supports your objection. An original and one copy of your objections must be received in the office of the United States District Court Clerk no later than fourteen (14) days from the date of the findings and recommendations. The copy will be furnished to the opposing party. Failure to file timely objections may result in waiver of the right to appeal questions of fact.

If you are objecting to the recommendation and also desire to submit new, different, or additional evidence, and to have a hearing for this purpose before the District Judge, you must, at the same time that you file your written objections, include the following:

1.      Why the record made before the Magistrate Judge is inadequate.

1

2.      Why the evidence proffered at the hearing before the District Judge (if such a hearing is granted) was not offered at the hearing before the Magistrate Judge.

3.      The detail of any testimony desired to be introduced at the hearing before the District Judge in the form of an offer of proof, and a copy, or the original, of any documentary or other non-testimonial evidence desired to be introduced at the hearing before the District Judge.

From this submission, the District Judge will determine the necessity for an additional evidentiary hearing, either before the Magistrate Judge or before the District Judge.

Mail your objections and "Statement of Necessity" to:

> Clerk, United States District Court
> Eastern District of Arkansas
> 600 West Capitol Avenue, Suite A149
> Little Rock, AR 72201-3325

## I.      Introduction

Plaintiff Alan Bell is a state inmate incarcerated at the East Arkansas Regional Unit (EARU) of the Arkansas Department of Correction (ADC).   He filed this pro se action pursuant to 42 U.S.C. § 1983, seeking damages from Defendants for allegedly failing to protect him from an attack by another inmate (Doc. Nos. 2, 6).

This matter is before the Court on the Motion for Summary Judgment, Brief in Support, and Statement of Facts filed by Defendants James Dycus, Jaylynn Gardner, Leroy Golatt, and Jeremy Andrews. (Doc. Nos. 51-53) Plaintiff filed responses (Doc. Nos. 59-

60) and Defendants filed a reply (Doc. No. 63)

## II.     Amended Complaint (Doc. No. 6)

On July 25, 2019, Plaintiff was stabbed in the head, neck and arm by inmate Cleveland Wright in 14 barracks. (p. 4) Plaintiff alleged Wright previously stabbed someone in 18 barracks, was moved to 15 barracks where he threatened another inmate, and then moved to 14 barracks. (Id.) Defendant Gardner was the only officer on duty in the location and Defendant Golatt assigned her to supervise four barracks, which included 200 inmates. (Id.) Gardner did not supervise Plaintiff's barracks at the time of the incident, as she was monitoring traffic in the hallways, and she failed to call for assistance for several minutes once she realized what was happening. (pp. 4-5) Andrews failed to protect him because he failed to properly classify inmate Wright as a dangerous inmate and approved only one security officer to supervise four barracks. (p. 5) Dycus also failed to protect Plaintiff because he classified inmate Wright for general population even though Wright only served a few months of isolation after he exhibited violent tendencies and threatened to kill other inmates. (Id.) Defendant Golatt allowed only one security officer to supervise two hundred inmates, knowing that Wright was violent and had a history of stabbing fellow inmates. (Id.) Plaintiff asked for compensatory and punitive damages from Defendants. (p. 7)

## III.    Summary Judgment

Pursuant to FED.R.CIV.P. 56(a), summary judgment is appropriate if the record shows that there is no genuine issue of material fact and the moving party is entitled to

judgment as a matter of law.   See Dulany v. Carnahan, 132 F.3d 1234, 1237 (8th Cir. 1997).   "The moving party bears the initial burden of identifying 'those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact.'" Webb v. Lawrence County, 144 F.3d 1131, 1134 (8th Cir. 1998) (quoting Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (other citations omitted)).   "Once the moving party has met this burden, the non-moving party cannot simply rest on mere denials or allegations in the pleadings; rather, the non-movant 'must set forth specific facts showing that there is a genuine issue for trial.'" Id. at 1135.   Although the facts are viewed in a light most favorable to the non-moving party, "in order to defeat a motion for summary judgment, the non-movant cannot simply create a factual dispute; rather, there must be a genuine dispute over those facts that could actually affect the outcome of the lawsuit." Id.

## A.  Defendants' Motion

### 1)      Official Capacity Liability

The Court initially agrees with Defendants that Plaintiff's monetary claims against them in their official capacities should be dismissed, pursuant to sovereign immunity. See Will v. Michigan Dep't of State Police, 491 U.S. 58, 64 (1989).

### 2)      Individual Capacity Liability

Defendants also ask that the individual capacity claims be dismissed, pursuant to qualified immunity, which protects officials who act in an objectively reasonable manner. It may shield a government official from liability when his or her conduct does not violate

"clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982).   Qualified immunity is a question of law, not a question of fact.   McClendon v. Story County Sheriff's Office, 403 F.3d 510, 515 (8th Cir. 2005).   Thus, issues concerning qualified immunity are appropriately resolved on summary judgment. See Mitchell v. Forsyth, 472 U.S. 511, 526 (1985) (the privilege is "an *immunity from suit* rather than a mere defense to liability; and like an absolute immunity, it is effectively lost if a case is erroneously permitted to go to trial.").

To determine whether defendants are entitled to qualified immunity, the courts generally consider two questions: (1) whether the facts alleged or shown, construed in the light most favorable to the plaintiff, establish a violation of a constitutional or statutory right; and (2) whether that right was so clearly established that a reasonable official would have known that his or her actions were unlawful.   Pearson v. Callahan, 555 U.S. 223, 232 (2009).[1]   Defendants are entitled to qualified immunity only if no reasonable fact finder could answer both questions in the affirmative.   Nelson v. Correctional Medical Services, 583 F.3d 522, 528 (8th Cir. 2009).

In support of their Motion, Defendants present their declarations, Plaintiff's deposition testimony, the incident report, and the video recording.

---

[1]Courts are "permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." Nelson, 583 F.3d at 528 (quoting Pearson v. Callahan, 555 U.S. at 236).

### a)    Gardner incident report (Doc. No. 51-6)

On July 25, 2019, at approximately 12:49 a.m., Defendant Gardner observed an altercation in the dayroom of 14 barracks.   Inmate Keywood sat on the bench with a bloody shirt, bleeding from his throat, and inmate Wright stood by him with a weapon in his hand. All rovers were called for assistance. Gardner also observed Wright walk over and stab Plaintiff Bell, who stood under the stairs. All rovers arrived and gave Wright several direct orders to drop the shank and get down on the floor to be restrained. Wright was placed in restraints, afforded medical treatment, and placed in restrictive housing, while Keywood and Bell were taken to the main infirmary for medical treatment.

### b)    Declaration of Jeremy Andrews (Doc. No. 51-1)

Andrews is the Warden of the EARU, which includes the maximum security unit, (Max) where inmates are housed in disciplinary confinement. (p. 1) His duties include supervising the Unit operations, hiring and promoting staff, reviewing the recommendations of the classification committee, and deciding whether to release inmates from the Max Unit. (Id.) Sometimes inmates are released from Max without the recommendations of the classification committee, when necessary to make space for other inmates in need of disciplinary confinement. (pp. 1-2) When making this decision, he reviews the disciplinary files and class statuses to assess the risk, and considers the length of time an inmate served in disciplinary confinement, plus the inmate's history, progress though the stepdown program and whether the inmate has an enemy in the facility. (p. 2) The fact that an inmate was previously involved in an altercation does not automatically

mean he is a threat or unable to function in general population, and each case is individually addressed. (Id.)

In June 2019, Andrews concluded that it was appropriate to reintegrate inmate Wright from Max into general population. (Id.) Wright first was assigned by the building major to barracks 16 in the north hall, and was later moved to barracks 14 as a precaution for his safety, and not because he made any threats to others. (pp. 2-3) Although most inmates in that barracks are class 1 or 2, Wright was classified as 4. (p. 3.) During that time the EARU was appropriately staffed in accordance with the requirements of the Association of Correctional Accreditation (ACA). (Id.) On July 25, 2019, all critical and priority one posts were staffed in accordance with ACA requirements, and in the north hall, one officer was assigned to barracks 13-16, one to barracks 17-20, and a zone sergeant was assigned to the area. (p.4) Barracks have a large window to the hallway and a person who looks though that window can see from the front to the back of the barracks. (Id.) The officer on the door monitors activity inside the barracks and the traffic in the hallway of the area. (Id.) If an incident occurs inside the barracks, the officer on the door should not enter the barracks alone, and should call for all available rovers, who should not enter until a sufficient number of staff members to form a team safely respond. (p.5) If an inmate has a weapon, staff is not to enter the barracks until the supervisor arrives with a less lethal weapon to subdue the armed inmate. (Id.)

Andrews reviewed the video of the incident at issue (Doc. No. 51-2), which occurred on July 25, 2019. (Id.) The recording began at 12:53:59 a.m. with two inmates on

a bench in the dayroom area, Plaintiff on the left and inmate Willie Keywood on the right. (Id.) At 12:54:07, inmate Wright appeared and approached Keywood, and at 12:54:18, Wright appeared to swipe at Keywood and Keywood reacted. (Id.) Plaintiff Bell stood and moved to the area under the stairs at 12:54:46, and Wright then approached Bell. (Id.) Staff turned on overhead lights at 12:55:47 and Capt. McNary entered the bullpen with a taser pointed at Wright at 12:56:14. (p. 6) McNary and Golatt then entered the barracks and ordered Wright to drop the weapon, and Wright left the barracks at 12:56:31. (Id.) Two minutes and seven seconds elapsed between the time Wright approached Keywood to the time McNary entered the barracks. (Id.)

### c)   Dycus declaration (Doc. No. 51-3)

Dycus is Deputy Warden at EARU Max, where inmates are housed in disciplinary confinement. (p. 1) He also chairs the classification committee, which evaluates inmates and makes classification and placement recommendations. (Id.) The recommendations are sent to the Unit Warden who has the final decision over whether to release an inmate from Max to general population. (Id.) Sometimes a warden releases an inmate from Max without a recommendation from the classification committee, to make space for other inmates in need of disciplinary confinement. (p. 2) Dycus was not involved in the classification of inmates in general population at EARU, or in staffing or scheduling decisions there. (Id. ) Dycus knew of Wright and of the July 25, 2019 incident, but did not know Bell. (Id.) He did not recall a conversation with Plaintiff Bell about Wright, and although he may have spoken to him during rounds, he did not tell him Wright should not

have been out of the Max Unit, or that he would not have placed Wright into general

population. (Id.) Dycus does not have the authority to release an inmate to general

population, and he did not possess any facts to suggest that Wright was likely to have an

altercation with any inmate, or facts to suggest that additional security was needed in

north hall on July 25, 2019. (p. 3)

### d)    Golatt declaration (Doc. No. 51-4)

As a Lieutenant, Golatt assigns officers to posts at the beginning of each shift, and

on July 25, 2019, all critical and priority one posts were staffed. (p.1) He is not a member

of the classification committee, and he responded to the call for rovers in barracks 14 on

July 25, 2019. (Id.) Because inmate Wright possessed a weapon, Golatt could not enter

the barracks until the shift supervisor arrived with a taser or chemical agent. (Id.) Wright

ultimately complied after he was given several direct orders to drop his weapon and get

down on the floor, and he was removed from the barracks. (pp. 1-2) Bell was taken to the

infirmary for medical treatment. (p.2) At the time of the incident, which occurred during

morning chow, Defendant Gardner was facilitating morning diabetic shot call in barracks

13-16 by monitoring traffic in the hall as inmates came and went from the infirmary

window. (Id.) There was no prior indication that inmate Wright was going to have an

altercation with any inmate, and nothing to suggest the need for additional security in the

north hall. (Id.)

### e)    Plaintiff Bell's deposition (Doc. No. 51-5)

On July 25, 2019, Defendant Gardner stepped into Plaintiff's barracks and called

him to get up and get ready for diabetic shot call. (p. 18) Plaintiff got dressed and sat in

the dayroom to speak with inmate Willie Keywood, and when Plaintiff gave Keywood

some advice, inmate Wright agreed. (Id.) Then Wright grabbed Keywood around the

throat and cut him and Keywood took off running and screaming and hollering. (p. 19)

About five minutes later Defendant Gardner finally came to the door to see what

happened and called for assistance. (Id.) Plaintiff got up out of the way and backed up

under the stairs and Wright followed him and said he would kill him. (Id.) Wright swung

and cut Plaintiff on the top of his head and part of his ear, and skinned and stabbed

Plaintiff on his right arm and knuckle with the box cutter, at about 12:45 a.m. (Id.) At the

time, Gardner was sitting on the stairs in the compartment for the guards between 13-15

barracks and could not see anything until she went out into the hall. (p. 20-21) When

Keywood got cut, he ran and hollered and it took Gardner five minutes to get to the door.

(p. 21)

    After the incident, Dycus came to the infirmary to tell McNary to let them take

Plaintiff Bell to the trauma 1 center in Memphis. (p. 22) Dycus returned to the infirmary

the next morning and visited with Plaintiff and told him Wright was not supposed to have

been out of Max. (p. 23) Andrews was in infirmary when they were trying to stop

Plaintiff's bleeding, but he never said anything and Plaintiff did not talk to him. (p. 23)

Defendant Golatt was not in the infirmary (p. 24). Defendant Gardner knew he was cut

up bad. (Id) As far as Plaintiff knew, Dycus, Andrews, and Golatt were not in the

barracks when the incident occurred. (p. 25) Twelve guards stood out in the hallway and

nobody opened the door until McNary got there, stepped in, and told Wright to drop the

weapon and he did. (Id.) Golatt picked up the weapon and took it out to be secured, and

McNary handcuffed Wright and took him out. (Id.) Then they took Plaintiff and

Keywood to the infirmary. (Id.)

Plaintiff stated that Wright was first placed in 15 barracks where he threatened to

kill two people. (p. 26) He then was moved to 16 barracks, where he threatened to kill

two other people, and then to 14 barracks, where he had been housed for seven to nine

days prior to the incident. (Id.) Plaintiff did not have conversations with Wright prior to

that night in 14 barracks, and did not know him. (p. 26) Inmate Terrence Johnson later

told Plaintiff, after the incident, that inmate Wright had a problem with inmate Keywood.

(p. 27)   Plaintiff did not have any enemies and did not report any issues with Wright to

the ADC. (p. 28) Wright had been doing some kind of drugs, not sleeping, and everybody

stayed away from him. (Id.) Before the incident occurred, Plaintiff was not concerned

about Wright because he never came around him and Plaintiff slept downstairs while

Wright slept upstairs. (p. 29) Guards there said they were shorthanded, that there is

supposed to be one guard per 50 inmates in the halls. (Id.) Instead, the east hall has one

guard for four barracks and north hall has one guard for 13-16 and one for 17-20. (p. 30)

Defendant Gardner told him they were short staffed. (Id.)

In January 2019 (before the incident at issue), Wright attacked and stabbed an

inmate and was supposed to spend 18 months "back there" in a program but was released

to the (general population) barracks in July 2019. (p. 31) Wright is currently housed at

the super max. (p. 32)   Guards told Plaintiff that there is supposed to be one guard for

every 50 inmates, but Gardner was the only guard on 14 barracks at that time of the

incident. (p. 32) The guard in barracks 17-20 did not come up until Gardner called rovers

up. (p. 33) Plaintiff did not file a grievance about the staffing, and did not talk to any of

the Defendants about this issue before the incident. (p. 34) While he fears retaliation from

this lawsuit, he has not experienced any yet. (p. 35)

Plaintiff is upset that he was attacked for no reason, and he did not file a grievance

about the Defendants' alleged failure to properly classify Wright. (p. 36) Plaintiff had

never been attacked by an inmate before, was never in any kind of trouble. (p. 37) He

sued Dycus because the wardens and other officers are responsible for running prisons.

(Id.) Dycus also knew Wright was dangerous, and he told Plaintiff after the incident that

Wright should never have been let out of the Max. (p. 39) Dycus told Plaintiff he did not

find out about Wright being released from the Max until after he returned from having

days off, and stated he could not override someone else's decision. (p. 39) Plaintiff did

not know if Andrews knew of anything which would have made him think something

would happen that day, but everyone knew that Wright got high and got violent when he

was coming down off his high. (p. 40) Plaintiff also sued Dycus, Andrews and Golatt

because they are responsible for classifying inmates, even though he did not have specific

facts that they knew Wright could be violent before the July 25, 2019 incident. (p. 41) He

sued Gardner because she was one of the security officers there the morning he got cut,

and if she had been out in the hallway, Wright would not have cut as many people as he

did. (p. 42) She took too long to get to the door to see what the hollering and screaming was about and she could have called the rover a lot sooner. (p. 43)   Wright cut Plaintiff on the top left side of his head above his ear, about three inches, which required seven staples, and another cut a quarter inch below that about an inch long. (p. 47) Plaintiff was also cut on the left side of his neck about the breast bone, about an inch and a quarter, which needed stitches. (Id.) Plaintiff received medical attention for his injuries, and he was treated at the trauma center from 2 a.m. to about 8:30 a.m., and then returned to the prison infirmary where he stayed from Friday until Monday (pp. 48-49) His head still hurts when he gets a haircut and he has a lot of headaches and sleepless nights (pp. 50-51) He takes Tylenol and aspirin for his headaches, but has no medical restrictions as a result of the incident. (pp. 52-53)

## B.    Plaintiff's Response

In response, Plaintiff claims Defendants Andrews and Dycus failed to properly classify inmate Wright because he had been assigned to the Max unit for stabbing another inmate and therefore, was too dangerous to be housed in an open barracks. In addition, Defendant Gardner knew the unit was short on staff and failed to adequately respond when Wright first attacked inmate Keywood. He claims that when an inmate told Gardner that a stabbing was occurring, she did not immediately believe him.

## C.    Analysis

To support a failure to protect claim, Plaintiff must allege prove that Defendants were deliberately indifferent to the need to protect him from a substantial risk of serious

harm.   Newman v. Holmes, 122 F.3d 650, 652 (8th Cir. 1997). This claim has two

components, an objective one asking whether there was a substantial risk of harm to the

inmate, and a subjective one asking whether the prison official was deliberately

indifferent to that risk. Jackson v. Everett, 140 F.3d 1149, 1151 (8th Cir. 1998). See also

Curry v. Crist, 226 F.3d 974, 977 (8th Cir. 2000).   In addition, prison officials are

entitled to qualified immunity when a failure-to-protect claim arises from injuries

resulting from a surprise attack by another inmate. Tucker v. Evans, 276 F.3d 999, 1001

(8th Cir. 2002).

In this particular case, there is no dispute that the attack on Plaintiff was a surprise,

and although he claims Defendants were deliberately indifferent by moving inmate

Wright from Max to general population, Plaintiff provides no evidence to support that

claim. Plaintiff admitted that he did not communicate with inmate Wright and had no

previous issues with him. In addition, although he alleged that Defendant Gardner was

lax in her response to the attack, he provided no evidence to show that she was

deliberately indifferent. According to the video evidence, approximately two minutes and

seven seconds elapsed from the time inmate Wright approached inmate Keywood to the

time Officer McNary entered the barracks to subdue Wright. And the evidence showed

that the officers followed ADC regulations and protocol which required extra precautions

when dealing with an armed inmate. Defendant Golatt also stated that he was not a

classification committee member and at the time of the incident he responded to the call

for all rovers but could not immediately enter the barracks until the shift supervisor

arrived with a taser or chemical agent. Plaintiff provided no evidence that he was confined under conditions posing a substantial risk of harm, especially since he was unaware that inmate Wright posed a threat of harm to him. The Court also reviewed the video of the incident (Doc. No. 51-2), and finds that Andrews' summary of that was accurate.

The Court also finds that many of Plaintiff's allegations against Defendants Andrews and Dycus are based on their supervisory position as wardens. Plaintiff stated in his deposition that Dycus, Andrews and Golatt were not in the barracks at the time of the incident and that he sued them because they are responsible for classifying inmates. (Doc. No. 51-5, pp. 25, 41) "In a § 1983 case, an official 'is only liable for his ... own misconduct' and is not 'accountable for the misdeed of [his] agents' under a theory such as respondeat superior or supervisor liability." Whitson v. Stone County Jail, 602 F.3d 920, 923 (8th Cir. 2010) (quoting Ashcroft v. Iqbal, 556 U.S. 662 (2009)). Therefore, the Court finds Plaintiff's allegations against Defendant Andrews and Dycus fail to support a constitutional claim for relief.

Therefore, absent additional facts or evidence from Plaintiff to show otherwise, the Court finds that Defendants acted reasonably under the circumstances, and that no reasonable fact finder could find that the facts alleged or shown, construed in the light most favorable to Plaintiff, established a violation of a constitutional or statutory right.

## IV.    Conclusion

IT IS, THEREFORE, RECOMMENDED that Defendants' Motion for Summary

Judgment (Doc. No. 51) be GRANTED, and Plaintiff's Complaint be DISMISSED with

prejudice.

IT IS SO RECOMMENDED this 3rd day of August, 2021.

_____
JEROME T. KEARNEY
UNITED STATES MAGISTRATE JUDGE